Good morning, gentlemen. The first case on today's docket is the case of Derrick Tate v. Illinois Dept. of Employment Security, et al., and we have Mr. William Schmidt. For the appellant, we have Christopher Turner for the appellee, as well as Daniel Price, and we've assigned your time, so you may begin when you're prepared to do so. Good morning, Your Honors. My name is Bill Schmidt. I represent American Equipment and Machine Inc., one of the appellants, the other being the Department, who is represented by Christopher Turner sitting at my table. If it please the Court, this is an unemployment compensation claim that worked its way through the multiple steps and levels of the Department of Employment Security, and at each such stage, each such level, the claim for benefits was denied. It comes to this Court after the Department of Unemployment Security referee heard the evidence and the testimony and assessed the credibility of the witnesses in denying the claim for unemployment benefits, and on appeal, the Board of Review affirmed and adopted the referee's findings. Although it was ultimately appealed to the Circuit Court and the Circuit Court reversed, this Court's consideration is really directed to the Board of Review's decision, and the first, and perhaps as important as anything, the first point to be made is the standard of review under which this Court looks at the Board of Review's decision. And in order to reverse the Board of Review, this Court must conclude that the Board of Review's decision is against the manifest weight of the evidence, and in this Court's very recent decision in Wise, the Court has provided some considerable guidance as to what that high standard means. The Board of Review's factual findings are prima facie true and correct, and the Court can only reverse if the Board's decision is clearly erroneous. The Court must reach the definite and firm conviction that a mistake has been committed. Other courts have used other language in describing this high standard, including it is only against the manifest weight of evidence. If no reasonable prior fact could have reached the result the Department reached here, or to put it another way, only where an opposite conclusion is clearly evident. Mr. Schmidt, do you think that the clearly erroneous standard is the same as against the manifest weight of the evidence? It is one way the courts have used to describe manifest weight of evidence. It's one of several different ways this Court and other courts have described the manifest weight of the evidence. So I'm not so sure I could say they are the same or different. It is a description of that what I guess we lawyers have come to feel is a term of art when using the phrase manifest weight of the evidence. Because we have abusive discretion, we have manifest weight of the evidence, we have clearly erroneous. We do. And one thing I can say with certainty is that the standard here is not to decide whether or not somewhere below there has been an abuse of discretion. I think we know that with certainty that that would be different than a manifest weight of evidence analysis. You think it would be different for the Board of Review? Yes, ma'am. Okay. Thank you. So with that having been said, what were the findings of fact made by the referee and adopted on appeal by the Board? One, that while employed by his employer, the plaintiff had been repeatedly counseled about professionalism, harsh play, and keeping the work area clean. Is that against the manifest weight of the evidence? We know with certainty that it was not. Evidence was uncontradicted regarding not just the boards that appeared in the handbook, but multiple instances of oral counseling and a written reprimand. It is also a found that the claimant, as he was finishing his pizzas of pizza, which he had for his lunch, he threw these crusts on the floor, but that took some interrogation before the plaintiff eventually admits it. And the story starts from, yeah, maybe I dropped a couple of pizzas to maybe a couple of pizzas fell out of my box to even actually later on, I think, with the referee, he said that the trash can was full so that he could only put the box in and not the multiple crusts so that he threw the crusts on the floor. But eventually he does admit he threw the crusts on the floor. Mr. Smith, can you give me your understanding of what this area is that the luncheons were eaten? Is it only used for lunch, or is it part of the workplace? Well, it is described as a place where employees could have lunch. It was not just a lunch area. And in fact, as the state of the fact indicated, it was kind of an L-shaped area, and work was being conducted in this area. Work related to what, though? Probably to some type of welding operation, since it's the primary work that is done at the facility. And in fact, it is a co-worker of the plaintiff when he returns following his own lunch to work that he sees the pizza crusts all over the floor, and he reports it to the supervisor. I understand that. What I'm trying to get at, is there kind of a designated area? I think somebody mentions a picnic table where lunches are to be eaten, and there might be a microwave or something along that line. It was a lunch area, yes, ma'am. It was one of, I think, probably multiple lunch areas in the plant so that workers could be close to their workstation. But the co-worker, and this was not clear to me, there was some indication that the co-worker had been working on a project in the area near the lunch table. True. And that, and this may or may not be correct, this part, that the pizza crust was actually thrown onto some of that work area as well as the floor. Is that true? That's what the co-worker reported to the supervisor, yes, ma'am. And was that before the ultimate Board of Review? I think it was part of, yes, ma'am, I think it was part of the initial evidence, and so it came to the Board of Review on appeal from the referee's decision. So this pizza crust was not just a couple of pieces as I understood it. I haven't seen the record. It was described in the record as seven, perhaps eight. Pieces of pizza. And no relationship, though, to where that worker had been working and it had actually been thrown on it. Yes. Is that in the record? Yes, I mean, it was in his work area because he's the fellow who comes back to his work area following lunch and sees the pizza in his work area and makes a complaint about it to the supervisor. Okay. How close was the trash area to this work area that this gentleman came back to? Judge Goldberg, I always hate to tell you I don't know, but I don't know. You're allowed to. That's okay. I promise. You can call on your sword. So my guess is as good as yours and as good as theirs, right? Okay. I'm not so sure that the trash can even becomes, and I may be wrong about this, and I've got two others who can correct me on this. I'm not so sure that the trash can thing even becomes pertinent until the case is already before the department, and that's when he. Well, I'm basically looking at the testimony, and I know there are conflicts about trying to put this box, and the trash area is full, and it falls over, and this and that. So I was just wondering, excuse me, about the proximity. Sure. And, of course, he gives that version after he's already given a version where perhaps they fell out of the box. Well, now there's no room for them. They're not even in the box. If they were in the box, why didn't they also fit into the trash can? But in any event, as we go through those steps and the findings by the referee, they are all supported by the evidence, and then ultimately, although the plaintiff disagrees with this in his brief, the referee finds in multiple occasions that the claimant's version, his testimony, was not credible, although plaintiff suggests that the plaintiff's credibility is not important here. Plaintiff makes much of his argument to focus on the claim that his conduct did not harm the employer's operations, which is one of the statutory requirements, although it is not an exclusive or definite requirement. In Wise itself, this Court observed that the Board of Review never provided any analysis regarding this aspect of harming the employer's operations, but nevertheless affirmed the Board of Review. You know, I do want to point out Wise was somewhat of a unique case in that respect, in that you're, as I recall, a shrimp that was warming at a station. Yes, ma'am. Because I was on the panel. And there was direct insubordination where the employee was requested by a supervisor to get additional ice and ice it so it could get to the proper temperature, and there was an outright refusal to do so. And while there wasn't actual harm that occurred, it's very obvious that we can all see if you let shrimp sit and warm, you're going to have a very obvious harm that's going to develop. Right. Yes, Your Honor, and I cannot make a public health argument. Okay. Because I have to turn over my time. Thank you. Thank you. Okay. Good morning, Your Honors. Good morning. May it please the Court, I'm Christopher Turner, the Assistant Attorney General here on behalf of the State Defendant's Appellants, the Department of Employment Security's Board of Review and its director. As counsel has explained, this is an administrative review action, so going to Your Honor's initial question about the standards of review, there is a distinction between clearly erroneous standard and manifest weight of evidence standard, but they're both highly deferential. Manifest weight of the evidence standard is a little bit more deferential, but clearly erroneous standard is still a highly deferential standard. And it gets to the point that either one, the fact that the Court disagreed, if it might disagree, with the Board of Review's conclusion, that's not enough of a basis to overturn it. It has to be something more than that. It's clearly evident that it couldn't rationally reach those decisions, the conclusions that it did. And here, the Board of Review had evidence in the record that allowed it to rationally determine that this was misconduct. And just getting back to the standard review, it's the ultimate decision of misconduct that's under the clearly erroneous standard. The other findings along the way, the factual findings, believe that are under the manifest weight of evidence standard. Now, counsel was asking about the question about where the pizza crusts were. I could speak to that, but I think the more important point about that is as far as it goes to the question of whether or not there was a violation of the rules, regardless of where the pizza crusts were, and I believe if you look at C115 to 116, Supervisor Africano, that's where his testimony is describing where the pizza crusts were. And I think they were all the way over, not just at the picnic table, but over by the electric, the panel. He was an electrician, I think, John Owens. I think, though, that the issue that a couple of us have raised is this issue of harm that's required for the misconduct. And so I'm trying to figure out, that's why I asked about the panel, where in the evidence is there harm or potential harm to the employer? And so there is potential harm to the two violations. We have both the abuse of the facilities, but the throwing and leaving the pizza crusts scattered on the floor, and then there's the line for the investigation of that ruling for action. The harm is a potential harm, and it has to do with disrupting the workplace, first with the pizza crusts, throwing pizza crusts at his coworker, and then leaving it scattered about the room. That's disrupting the workplace, it's wasting his supervisor's time in investigating the matter, and it's setting a poor example for employee relations. And the courts have found that simply showing this kind of disruption to the workplace can be enough to establish potential harm to the employee unit. That's true also with the line after when there's the investigation. Instead of cooperating with the investigation, he's dishonest. He's actually being dishonest, particularly about the deliberate nature of his actions and what he was doing, because he wants to cover it up because he had been reprimanded before for unprofessional conduct. And so by doing that, by trying to undermine an investigation and undermine the employer's effort to uncover what the truth is, that also is a potential harm in disrupting employee relations, setting a bad example, wasting his supervisor's time in those actions. Now, in the alternative, to satisfy the third element of this conduct, you can find either potential harm, or you can also find that either one of the violations was repeated despite a prior warning. And that is also there in the record as well, that there was this reprimand earlier for his unprofessional conduct. It wasn't the exact same behavior, but it was duct taping a coworker's locker shut. And that's the same sort of abusive property, abuse of the facility property and misbehaving. And he specifically warned in writing that he will be terminated if he engages in that kind of behavior again. Was that the only one prior written warning? I mean, they say there are multiple warnings, but they seem to be more oral. But there's one about the duct tape, right? Correct, Your Honor. There was one, yeah. It was Africano that mentioned that he had given oral warnings for him behaving and acting professionally at work. But that was the only reprimand that is in the record, at least that I'm aware of. Going back, then, to the violations, so I'm not going to administrate for view that the plaintiff, Tate, has even disputed that his filling the pizza crust, that that was a violation of the work rules. Instead, he wants to argue that he was only really fired for the line. But as we cite to the cases we cite to, all you need is one act of misconduct. If you're fired on a discharge for multiple reasons, if one of those violations constitutes misconduct, that would be enough to deny benefits under 602A. That's the Curto case we cite that does that. I think the Woods case, Woods v. Illinois Department of Employment Security, is quite explicit about that. His argument, instead, is that we should only look at lying and whether or not he actually lied. If it was his primary dispute below, then he would argue that he didn't really lie. But here, the board found that he wasn't straightforward during the investigation, and that was supported by evidence in the record. His general manager, Yates, testified that he first, in the beginning, said he had accidentally dropped a couple pieces of crust, but then admitted he was intentionally filling the crust of his coworker and potentially left it across the floor. Going back to the final element, I said there's evidence in the record that's sufficient to support that at least one of those acts of violation of the company rules either resulted in potential harm to the employer or also could have, at least the abuse of the facilities, the filling of a piece of the active course plate, is a repeat of the violation despite a prior warning. Now, in addition, he forfeited that argument because he never raised it in an administrative appeal to the board. Which argument was forfeited? Whether or not the third element was met. Under the case law, under Hearst, under all the decisions, it's the claimant's burden to prove that they are entitled to benefits. And then under the administrative rules, when you appeal the process, you first go to a claim adjudicator. If you lose there, you appeal to the referee. That's when you have a hearing. Takes evidence, and then you can appeal to the board of review, which is then the final decision. In his appeal to the board, you fill out a specific form. You write it down. You're required to at least just identify what are the basis of dispute. He never argued anything about that there was no damage, that there was no harm. He never made any argument that it was not a repeated violation. He just went back to his argument that I didn't really lie. By doing that, therefore, he forfeited any argument for the board of reviews since he didn't try to dispute that to the board of review. He decided to pursue that argument on administrative appeal before the circuit court in this court. Your Honor, unless you have any more questions about the appeal, I will. Did the board of review actually look at the prior conduct? It was in the record. There isn't discussion. But did the board of review actually look at that record? I mean, do we know that they reviewed that record? We do, Your Honor. It says in their decision when they accept the referee that they reviewed the entire record. Okay. So we do know that they did. So we have to make that assumption that the board of review did look at all of the evidence. Correct, Your Honor. Which would have included the duct-taped incident? It would have, Your Honor. That also was in there. It was both testimony and actually the written recommendation was in the administrative record. Even though it might not be specifically in the order, it's in the record. Correct, Your Honor. And they made a finding of misconduct. And they explained in the referee's decision adopted, here are the three elements of misconduct that are required, and it went through its conclusions and explicitly found that this constitutes misconduct. Correct, Your Honor. And we cite the Lackadmire decision, which goes somewhat to that point, that the board is not required to make every specific finding of that as long as it has looked at the review, tells the court that it's looked at the record, and then makes its findings. Right. Your Honor, unless you have any more questions? I'd like you to tell me how he would know that the type of conduct that he was not engaged in was similar or the same as the duct-taped incident. Your Honor, I think it would be just through his common sense. He knew that the prior conduct had to do with engaging in particular force play involving the company property and with his co-workers. He knew that to avoid – So he was warned to not engage in force play. Or other unprofessional conduct or treat his co-workers without respect. I mean, I think I have the document here. I'm sorry. Yeah, that he will conduct himself in a professional manner while at work and treat his fellow employees with respect. So, yes, that doesn't mean anything. If he fell asleep on the job and was reprimanded for that, that would be pretty far-field. That would not be the same type of behavior. But this is the same sort of unprofessional conduct. One is when he's duct-taping somebody's locker, somebody's company property. Or the other one is just spilling food and leaving it all over the floor. So these are the same general area of unprofessional conduct, just abusing the properties and not taking the rules seriously. But the first – the duct-taping was the one that gave rise to what you just read to. Correct. So he couldn't have – I mean, he couldn't have known that before he committed the duct-taping. In other words, the duct-taping comes first, then the warning. Correct. That he must conduct himself in a professional manner and respect his co-workers. Yes, Your Honor. That's absolutely right. So that's how – that's the timing of it. That's the timing. If this happened, and then I think six or seven months later, then this is what happened. So the first reprimand is this language. Yes, Your Honor. Okay. Thank you. Thank you. For your arguments. Mr. Price? Good morning, Your Honor. Good morning, Mr. Court. Dan Price, appointed home attorney for Mr. Tate. It's probably poor form to suggest a question to the court, but were I in your shoes, whether the proper standard is clearly erroneous, or the manifest weight, or however it would be properly categorized, I would think that a threshold question would be, how do you say, Price, that this is against the manifest weight of the evidence? And factually, you're on the horns of a little bit of a dilemma representing Mr. Tate, because he was found not to be credible. So you've got to look at the testimony that is in the record and not try to say Mr. Tate should be believed over someone else, because that's not likely to get you anywhere. And so if we look at the administrative law judge's decision, and that decision was adopted by the Board of Review as and for their own, the specific finding is contained in that on several occasions about keeping the shop area clean. Despite these admonitions, he intentionally threw pizza crusts on the floor. Now, it would be our contention that that is just wrong, and that it's not supported by anything in the evidence. There is absolutely nothing in the record of any type that would suggest that Mr. Tate had been disciplined, admonished, or otherwise criticized for anything about workplace cleanliness. So the only thing we're going to see in the record is the warning, the written warning about the duct tape. In July of 11, he duct taped a co-employee's locker, and that's in the record. That is a written discipline. The man who made the decision to fire Tate was asked, and this is, I think, C-109, had he ever done that before, where he'd thrown food or other trash on the floor and not picked it up? The answer, Mr. Yates, no, not to my knowledge. What page number was that, sir? That is C-109, I think. At the same time, the question is asked, had he ever been accused of lying to you, to yourself, or any other member of management at American Equipment? And the answer is given, no, not to my knowledge. So, Mr. Price, do you think that an individual is entitled to employment benefits under certain circumstances of termination if you can surgically excise each piece of conduct and say that, well, he wasn't admonished on this one, but then he threw pizza at his co-worker, or he duct taped somebody's locker? I mean, can we surgically excise each piece of conduct and then say, okay, you get the benefits? Is that really what this statute's about? Well, I think what the statute's about, the whole unemployment compensation situation is supposed to be remedial in nature. And I think the misconduct idea is that somebody shouldn't be able to behave in such a way as to intentionally get themselves fired and then go out and collect unemployment benefits. Not just intentionally get themselves fired, but intentionally interfere with the workplace. Well, I think that at the end of the day, you've got to apply the statute to where the statute's written. And, you know, the employment requires three things, willful and deliberate conduct, violation of reasonable work rules and policy, and either harm to the employee or unit or civil violations despite repeated explicit previous warnings or instructions. And I think that explicit tells us a lot. I mean, he wasn't fired for horseplay. They don't say he was fired for horseplay. They say he was fired for abuse of company property and not telling the truth. And so to answer your question, I don't know whether or not you surgically excise these things. But when the statute says explicit warning, I think it's fair to part, not be parsing, but to separate a horseplay issue from a workplace cleanliness issue. They're different things. Workplace cleanliness, though, is just such a term I have trouble with when you have somebody throwing pizza around. I mean... Well, I don't suspect. You know, I mean, the pizza crust being thrown. Of course, now Tate says there was a trash can nearby. But then you have, I mean, duct taping somebody's locker. I mean, I just have trouble with the fact that we're excising these pieces out and saying, okay, well, we weren't worried about this, but this one doesn't fall into that box. So I can't count that one. I'm telling you that I'm wrong. I'm not going to try to convince the court that duct taping somebody's locker is mature behavior or it's something that should go on. It's a young man, and it's probably something he shouldn't have done. He was counseled for it, and then, well, it goes from July to March of the next year, I think, and then this incident occurs. It's probably worth noting that I think it's Mr. Yates or Mr. Africano, this whole thing where Tate was fired was a three- or four-minute encounter. It wasn't something that was ongoing, and it wasn't something that was persistent. It was just that moment in time, and he was accused of mischaracterizing intentionally versus dropping the pizza crust, and they didn't like that and fired him. And that doesn't strike me as something that you can say because he was chastised or written up about putting duct tape on a locker that he should expect to be fired for. I mean, that's just a – it is similar in the sense that they're both probably conduct that an employer doesn't have to tolerate, but the statute says explicit, and these are different things if you take that explicit and give it the meaning that it should be given in a situation like this. To do otherwise and to say that this broad category should apply is, in fact, as we say in the brief, rewriting the statute to make it something that it doesn't say. If there's harm here, I don't know where I would point to it.  Is there any evidence in the record that says there was ongoing miniature problems such that that three- or four-minute encounter was really the result of, okay, we've had it? Is there anything in the record like that? There may be one reference by Mr. Africano to him. He talked to Derek at different times, something to that effect. There's certainly nothing else in writing, and there's nothing else known to anyone about these specific issues. But I think Mr. Africano did make a point. I've talked to Derek before, something to that effect. I believe that's somewhere in the record. I think that's the biggest single thing that the court can focus on to determine whether or not this was a decision that was clearly erroneous. Certainly the trial court thought that was the case. Mr. Turner makes an argument that I'd like to briefly address about the waiver question. And I really, if you look at the Hearst case that he talked about, there's another one in the reply brief called Tiggin, something to that effect. I may have the name not quite right. I think he's asserting a hyper-technical position. These administrative review positions, everybody in this case, for example, knew that the issue was misconduct. Now, I didn't go through the statutory definition of misconduct in front of the ALJ. And, in fact, in front of the Board of Review, we gave a very simple appeal notice, and they didn't even accept it because apparently the proof of service wasn't right. They didn't tell you that until they issued their decision. But I guess if they didn't accept any argument that we made, I think Mr. Turner would say that we can't be here at all because nothing has been asserted in front of the Board of Review. Their decision says they looked at the entire record, and the entire record would indicate the testimony. It would indicate Mr. Tate's application. And in that, from the very beginning, he said there was no damage to anyone that occurred because of this. And I think if you do look at the underlying purpose, 602A, the misconduct definition, you know, the decision isn't whether it was wise or smart to fire Tate. The decision is does the reason for his termination constitute misconduct under that statute? And I respectfully suggest that the decision that it is, when the definition is strictly construed, is clearly erroneous against the manifest weight of the evidence. Obviously, up to you. I'd call it a de novo review, but maybe it's more than that. What's your best case to say that this kind of horseplay and basically being a jerk does not rise to the level of the statutory definition of misconduct? It's not in the statute. It's just not there. I mean not, but the definition of misconduct. The definition of misconduct is really pretty clear. It means a deliberate and willful violation of a reasonable rule governing the workplace. The violation is you've got to harm somebody, and it's got to be despite a warning or other explicit instruction from the employing unit. I mean, I don't know, Your Honor, if it said don't be a jerk, you'd be a jerk. She's off, you know. You're basing your argument essentially so I understand it as to specific warning and no evidence in the record of any type of harm or disruption. Well, I certainly don't think there is. I don't see the word explicit. Maybe I have the wrong year. Well, maybe I do, but 602A on page 5 was my intended. I see repeated by the individual despite a warning. Or other explicit instruction from the employing unit. I also noted that when you were stating that you said and has been repeated. There's an or there. Well, that third problem is either you want to satisfy it. If you have harm, I don't think you need to have an explicit warning. If you have an explicit warning, I don't think you need harm. Right. I think that's pretty clear. I don't think either one is present here. And that's essentially the claimant's position. And if there isn't something else you want me to address, I'll sit down at this point. Thank you. Thank you very much.  Do you have rebuttal? Yes, Your Honor. Mr. Turner. Your Honor, this counsel focuses just on the language in the referee decision, which was also the Board of Review's decision that it adopted. About that he had been counseled many times about keeping his work area clean. That is supported in the record if you look at both at Africano's testimony at C-121 to 122. He testifies that he told all his employees, including Tate, many times to keep their work areas clean. And then Tate also, I believe, testified himself, testified at C-120 that, yes, I was told many. He agreed that he had been told many times to keep his work area clean. The reprimand itself was not for keeping his work. The prior reprimand was not specific about keeping your work area clean. As we discussed during my opening argument, it goes back to the written reprimand for duct taping the locker. This case, though, it's about – it's a standard misconduct. It sets out three elements. All there needs to be is some evidence in this record to support the Board's finding that three elements were met. Enough that it could rationally reach that conclusion. The evidence was there, Your Honor, for the rule violations. We believe it was there also for potential harm through its disruption of the workplace, through its wasting of the supervisor's time, through the poor example that it set. And also in the alternative, it was a repeated violation of additional unprofessional behavior involving abuse of company property and mistreatment and treating coworkers without respect. This evidence would be then sufficient to support the Board's final decision. If you have any questions, I'd be happy to answer them. No, thank you, Mr. Turner. Thank you, Your Honor. So then, for the reasons set forth in our briefs and put forth today, we ask that you affirm the decision. Thank you all for your briefs and your arguments. We'll take the matter under report.